UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
CARMEN CRUZ,

                                    Plaintiff,                              **DECISION
                                                                           AND ORDER**

                    -against-

HENRY MODELL & COMPANY, INC. d/b/a
and/or a.k.a MODELL'S SPORTING GOODS,                        CV 05-1450 (AKT)
and GREGORY KELLERMAN (in his
individual and official capacity),

                                    Defendants.
-----------------------------------------------------------X

      **A. KATHLEEN TOMLINSON, Magistrate Judge:**

      After trial of this civil rights action, the jury rendered a verdict in favor of Plaintiff, Carmen

Cruz.  Defendants Henry Modell & Company, Inc. d/b/a and/or a.k.a Modell's Sporting Goods

("Modell's") and Gregory Kellerman (in his individual and official capacity, "Kellerman")

(together with Modell's, "Defendants") have moved for a new trial, pursuant to Federal Rules of

Civil Procedure 49(b) and 59(a).  Plaintiff has moved for attorney's fees pursuant to 42 U.S.C.

§ 1988 and for taxable costs pursuant to Rule 54.1 of the Local Rules for the United States District

Court for the Southern and Eastern Districts of New York.  The decision on the motion for

attorney's fees is set forth in an accompanying Order.  For the reasons set forth below, Defendants'

motion for a new trial is DENIED.

## I.     BACKGROUND

      Plaintiff commenced this action alleging violations of  42 U.S.C § 1981, 42 U.S.C.

§ 2000a, the New York State Civil Rights Law, the New York State Executive Law, as well as

claims of false imprisonment, negligence, defamation, intentional infliction of emotional distress, negligent infliction of emotional distress and vicarious liability.  Plaintiff alleged that Defendants committed racially discriminatory acts against her which deprived her of her federally protected rights.

During the trial, evidence was presented that on March 18, 2004, Olga Sanders and the Plaintiff had decided to go shopping to purchase some sports jerseys for their daughters to wear to a 16th birthday celebration for one of the Sanders' cousins.  Trial Transcript ("Tr.") at 39-41. Plaintiff and Olga Sanders were long time friends.  *Id.* at 39.  They decided to take a trip to the Tanger Mall Outlet in Riverhead, New York.  *Id.* at 42.  The two friends were accompanied by Tiffany Sanders who was 14 years old at the time.  *Id.* at 41.  When they were unable to find the sports jerseys they wanted at the Nike outlet store, a sales assistant there directed them to the Modell's store about half a mile away.  *Id.* at 44.  Plaintiff, along with Olga Sanders and Tiffany Sanders went to the Modell's store in search of the jerseys.  *Id.* at 44-45, 289, 303.

Plaintiff testified that shortly after she arrived at the Modell's store, she was approached by Defendant Kellerman while in the men's jerseys section.  *Id.* at 305-304.  Defendant asked if she needed help.  *Id.*  Plaintiff testified that she asked "where is your children's section."  *Id.* at 304. According to Plaintiff, she had not, up to this point, handled any merchandise in the store.  *Id.* at 305.  Defendant Kellerman testified that as he approached Plaintiff, he witnessed her "tugging, a pulling motion on the mid-chest section of the jersey."  *Id.* at 666; *see also* 667.

Plaintiff then proceeded to the children's section where she was approached by Defendant Kellerman for a second time.  *Id.* at 305.  She located the jersey she was interested in, selected a matching hat and then located Olga and Tiffany Sanders.  *Id.* at 307.  The three of them had found

what they needed and were about to proceed to the register when Plaintiff was approached by police officers. *Id.* at 50-51, 120, 308. The officers informed Plaintiff that she had been accused of shop lifting by Defendant Kellerman. *Id.* at 308. Plaintiff was handcuffed in front of her friends and led from the store. *Id.* at 51, 308. Neither Plaintiff nor Olga Sanders were permitted to purchase the items they had selected. *Id.* at 58-59, 148-49, 170. Ms. Sanders overheard Defendant Kellerman saying "why you people have to come down here and shop." *Id.* at 62.

Defendant Kellerman completed a civilian arrest form stating that he wanted Plaintiff arrested. *Id.* at 440. According to Riverhead Police Officer Benjamin Goodale, the complainant – Defenant Kellerman in this case – signed the bottom of the form attesting to the fact that he placed the person under arrest and what the person was being arrested for. *Id.* at 440-41. Because this was a civilian arrest, Defendant Kellerman signed the form and verbally announced to Plaintiff that she was being placed under arrest for petit larceny. *Id.* at 440, 443. Plaintiff was arrested and charged with attempted petit larceny and attempted criminal mischief. Plaintiff was taken by police car to the Riverhead police station. *Id.* at 321. Plaintiff was placed in a cubicle and handcuffed to a bar. *Id.* at 322. She was handcuffed for three hours. *Id.* at 312. Plaintiff remained in the police precinct for several hours, was required to use the bathroom while accompanied by an officer and felt she was ridiculed for attempting to steal a New York Jets football jersey. *Id.* at 324-25. Sometime later that day, Defendant Kellerman came to police headquarters at 210 Howell Avenue and signed the charges. *Id.* at 444. Police Officer Goodale testified that Plaintiff would not be released until Defendant Kellerman came to sign the charges. *Id.* at 444-45. Goodale handled processing of the arrest and the paperwork. *Id.* Approximately one year later, Plaintiff went to trial in Suffolk County on the criminal charges and was found not guilty on all counts. *Id.*

at 334, 346, 622.

At the instant trial, Plaintiff offered testimony concerning the effect the actions of Defendants had upon her. Plaintiff testified that at the time of her arrest she was "confused . . . didn't know what was going on . . . devastated . . . embarrassed . . . [and] humiliated . . .being placed in handcuffs in front of all these police officers, in front of Tiffany, and she's a child." *Id.* at 311. After March 2004, Plaintiff "shut down," she was "afraid to go anywhere thinking something was going to happen to me." *Id.* at 347. She stopped dating, going to bible study and socializing in general. *Id.* at 348. Plaintiff testified that even "after the [criminal] trial, [she] was still depressed even though [she] was found not guilty." *Id.* at 346. Plaintiff further testified she experienced "night sweats, particularly thinking someone is coming to arrest me." *Id.* at 359. She experienced sleeping problems, anxiety and weight gain. *Id.* at 402. According to Plaintiff, she had difficulty going shopping for fear of being arrested. *Id.* at 420. In April 2005, Plaintiff sought treatment from Dr. James Lassiter, a clinical psychologist, at the urging of her mother, lawyer and doctor. *Id.* at 226, 229, 354. According to Plaintiff, her treatment "didn't go so good," because "[e]verytime [she] talk[s] about this, it's a reminder of what happened to [her] on that day." *Id.* at 355.

The testimony of Plaintiff was corroborated by the testimony of her friends and treating psychologist. Olga Sanders testified that Plaintiff's behavior changed significantly after her March 2004 arrest. *Id.* at 65-66. This testimony was corroborated by Tiffany Sanders. *Id.* at 173. According to Olga Sanders, Plaintiff "didn't bother to come outside at all," *id.* at 65, the incident "gets her depressed," "feeling very bad, nervous." *Id.* at 68. Olga Sanders also testified that she had observed a change in Plaintiff's relationship with her daughter. *Id.* at 75. Tiffany Sanders

4

testified that after the incident, Plaintiff "didn't want to come outside much," "she was real mellow, into herself most of the time." *Id.* at 174.

Dr. James Lassiter, Plaintiff's treating psychologist, testified that Plaintiff "was having difficulty with feelings of anxiety with issues around avoidance and dissociation." *Id.* at 231. Dr. Lassiter stated that Plaintiff was "having some difficulties trying to manage her tension and her stress and was not able to handle it well. *Id.* He concluded that Plaintiff was suffering from a "generalized anxiety disorder." *Id.* at 240-41. When asked if he had made a determination at the time of treatment as to the source of Plaintiff's stress, he stated that "[i]t certainly appeared to be the experience that she had in the arrest at the department store and the following processing at the police department." *Id.* at 231. Dr. Lassiter testified further that Plaintiff did not continue with her treatment because "it just felt lousy to keep talking about it." *Id.* at 255-56.

Plaintiff alleged that the events which occurred in Modell's that day were racially motivated and that she was falsely arrested and falsely accused of criminal activity. Plaintiff asserted additional state law claims for false imprisonment, negligence, defamation and emotional distress. Defendants denied that the events which occurred in the Riverhead Modell's store in March of 2004 were racially motivated and asserted that there were sufficient grounds for the store manager to involve the police and to effect the arrest of Plaintiff.

Prior to the commencement of the trial, Plaintiff withdrew her claims for violations of 42 U.S.C. § 2000a, New York Civil Rights Law § 40 and negligent infliction of emotional distress. On March 5, 2007, the case went to trial before a jury. At the close of evidence, the Court dismissed the claim for intentional infliction of emotional distress. On March 13, 2007, after a six day trial, the jury returned a verdict. The jury awarded Plaintiff a total of $338,004.72 in

compensatory damages and $150,000 in punitive damages on Plaintiff's claims of intentional discrimination under 42 U.S.C. § 1981, false imprisonment and negligence. Defendants were found not liable for violation of New York Executive Law § 296 nor for the state law defamation claim.

## II. **DEFENDANTS' MOTION FOR A NEW TRIAL**

Defendants have moved for a new trial pursuant to Rules 49(b) and 59(a) of the Federal Rules of Civil Procedure. They argue that a new trial is warranted because: (1) the jury's verdict was inconsistent; (2) the compensatory damages were grossly excessive; (3) the punitive damages were not warranted and/or they were grossly excessive; and (4) the testimony of Dr. James Lassiter was improperly admitted. For the reasons discussed below, Defendants have not met their burden to establish that a new trial is warranted.

### A. Standard For A New Trial

This Court should grant a motion for a new trial if it "'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)(quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988)), *cert. denied,* 526 U.S. 1130 (1999) . A court has the power to grant a new trial even if substantial evidence supports the jury's verdict. *See Landau,* 155 F.3d at 104. The trial court is free to weigh the evidence, including witness credibility, for itself, and need not view it in the light most favorable to the non-moving party. *Id.* "[W]here the resolution of the issues depend[s] on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Id.* at 104-05 (quoting *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir. 1992)). "However, these principles of deference to the

jury do not override the trial judge's duty to see that there is no miscarriage of justice." *Id.* at 105.

This is a less stringent standard than the standard applied to a motion for judgment as a matter of law, *King v. Macri,* 800 F. Supp. 1157, 1160 (S.D.N.Y. 1999) (quoting *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir. 1987)); however, "Rule 59 is not a vehicle for relitigating old issues . . . or otherwise taking a 'second bite at the apple'. . . ." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998). Rather, "[a] motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (quoting *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir. 1992)). "On a motion for a new trial, the moving party bears the significant burden." *Trinidad v. American Airlines, Inc.*, No. 93 Civ. 4430, 1997 WL 79819, at *1 (S.D.N.Y. Feb. 20, 1997).

B.    Inconsistent Verdict

Defendants contend that the jury's finding that Defendants are liable under 42 U.S.C § 1981 for denying Plaintiff the right to contract, but not under New York Executive Law § 296 for denial of equal access to public accommodations based on race, cannot be reconciled. Because these two findings cannot be reconciled, Defendants argue, they are entitled to a new trial pursuant to Rules 59(a) and 49(b) of the Federal Rules of Civil Procedure.

Defendants quote Rule 49(b), General Verdict accompanied by answers to Interrogatories, to support their position. Fed. R. Civ. P. 49(b) provides:

> **(b) General Verdict with Answers to Written Questions.**
>    (1)    ***In General.*** The court may submit to the jury forms
>           for a general verdict, together with written questions
>           on one or more issues of fact that the jury must
>           decide. The court must give the instructions and

7

> explanations necessary to enable the jury to render a general verdict and answer the questions in writing and must direct the jury to do both.
>
> (2) ***Verdict and Answer Consistent.*** When the general verdict and the answers are consistent, the court must approve, for entry under Rule 58, an appropriate judgment on the verdict and answers.
>
> (3) ***Answers Inconsistent with the Verdict.*** When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may:
>
> > (A) approve, for entry under Rule 58, an appropriate judgment according to the answers, notwithstanding the general verdict;
> >
> > (B) direct the jury to further consider its answers and verdict; or
> >
> > (C) order a new trial.
>
> (4) ***Answers Inconsistent with Each Other and the Verdict.*** When the answers are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered; instead, the court must direct the jury to further consider its answers and verdict, or must order a new trial.

Fed. R. Civ. P. 59(b) provides:

> **(b)** **Time to File a Motion for a New Trial**. A motion for a new trial must be filed no later than 10 days after the entry of judgment.

Under Rule 49, where a verdict is truly irreconcilable and the jury has already been discharged, a district court may, but is not required, to order a new trial. *See Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 53 (2d Cir. 1992) ("When the verdicts are not capable of reconciliation and resubmission of the determinations for reconsideration or clarification is not possible because the jury has been discharged, a new trial may be – but is not always – required."); *see also Trinidad,* 1997 WL 79819, at *1. A party objecting to an allegedly inconsistent verdict is

not entitled to a new trial, and his objection may be deemed waived, if he failed to object to the inconsistency prior to the discharge of the jury. *Lavoie*, 975 F.2d at 54; *see also Haskell v. Kaman Corp.,* 743 F.2d 113, 123 (2d Cir. 1984) ("[t]o allow a new trial after the objecting party failed to seek a proper remedy [before the jury is excused] would undermine the incentives for efficient trial procedure and would allow the possible misuse of Rule 49"); *Bseirani v. Mahshie,* 881 F. Supp. 778, 784 (N.D.N.Y. 1995) ("[w]aiver is particularly appropriate where counsel is or should be aware of the inconsistency in the verdict, and where resubmission to the jury would [have] resolve[d] the ambiguity").

According to Defendants "[f]ollowing the verdict and before the jury was discharged, the defendants objected to the verdict and made an application to reserve all objections to be submitted in writing." Def. Op. Br. at 3. Defendants point to a statement made by Defendants' counsel that "[i]f we can note our objection to the verdict, and we would like to argue on paper." Tr. at 1218. This objection did not raise the purported inconsistency in the verdict.

Nevertheless, this Court finds that even if Defendants had properly objected to the inconsistency of the verdict after the verdict was rendered, the objection would have been untimely. Defendants' challenge to the jury's verdict on these two separate causes of action is not properly raised pursuant to Rule 49(b). "Although not phrased as an attack on the sufficiency of the Court's instructions and verdict form, it is properly construed as such because both the instructions and the verdict form allowed the jury to find as it did." *Charts v. Nationwide Mutual Ins. Co.,* 397 F.Supp. 2d 357, 376 (D. Conn. 2005). In *Jarvis v. Ford Motor Co.,* 283 F.3d 33, 56-57 (2d Cir. 2002), the Second Circuit rejected the defendant's objection made pursuant to Rule 49(b) because "the alleged inconsistency was not among responses to interrogatories regarding

'issues of fact' but between two general verdicts based on different legal theories." *Id*. at 56. The court found that the jury charge and verdict sheet instructed the jury to continue on to the second cause of action, regardless of their finding with respect to the first. *Id.* at 55. Thus, the court concluded from "this charge, it is abundantly clear that the jury was instructed that it could find Ford liable under theories of *either* negligence *or* strict liability *or* both." *Id.* The defendants in *Jarvis* had objected to the inconsistency before the jury was released pursuant to Rule 49. Nevertheless, the court rejected defendants arguments holding that "[t]hough a motion under Fed.R.Civ.P. 49 might have been timely, it cannot as a matter of law, provide any relief for a party challenging a conflict between general verdicts based on instructions given in the jury charge and repeated on the verdict sheet." *Id.*

Similarly here, Defendants claim the jury's findings with respect to two separate causes of action are inconsistent. Defendants, however, never raised the potential for inconsistency at the charging conference, nor at any time prior to the verdict being rendered. The jury answered the questions posed to it on the verdict sheet and entered general verdicts on each of the causes of action charged, resulting in separate general verdicts. As a matter of law, Rule 49 cannot "provide any relief for a party challenging a conflict between general verdicts based on an instruction given in the jury charge and repeated on the verdict sheet." *Id.; see also Denny v. Ford Motor Co.,* 42 F.3d 106, 111 (2d Cir. 1994); *Lavoie v. Pacific Press & Shear Co.,* 975 F.2d 48, 54 (2d Cir. 1992); *Laborde v. City of N.Y.,* No. 93 CIV. 6923, 1999 WL 38253, at *7 (S.D.N.Y. Jan. 27, 1999) ("An objection to inconsistent verdicts raised for the first time in a post-trial motion is untimely and procedurally barred"); *accord Fabri v. United Technologies Int'l, Inc.*, 387 F.3d 109 (2d Cir. 2004) ("Because defendants' sufficiency challenge is truly an attack on the consistency of the contract

10

and CUTPA verdicts, defendants were required to object before the jury began its deliberations").

"Objection to an inconsistency between two general verdicts that is traced to an alleged error in the jury instruction or verdict sheet is properly made under Fed.R.Civ.P. 51." *Jarvis,* 283 F.3d at 56. Under Rule 51 of the Federal Rules of Civil Procedure, a party in a civil action must make specific objections to jury instructions before the jury retires to deliberate. *See* Fed. R. Civ. P. 51; *see also Jarvis,* 283 F.3d at 56-57. The failure to object results in a waiver of the objection. Defendants complain of an inconsistency between the jury's finding that Defendants violated 42 U.S.C. § 1981 but not N.Y. Executive Law § 296. This result was expressly allowed by the verdict sheet which specifically provided for two general verdicts and required that

> **If your answers to questions 1 <u>and</u> 2 are "YES," you have found a verdict in favor of the plaintiff CARMEN CRUZ against the defendants in the Federal Section 1981 denial of the right to contract and false arrest claim with regard to the March 18, 2004 incident. In that event, please proceed to question 3.**
>
> **If your answers to either question 1 <u>or</u> 2 is "NO," you have found a verdict in favor of the Defendants in the Federal Section 1981 denial of right to contract and false arrest claim with regard to the March 18, 2004 incident. In that event, please proceed to question 3.**

This instruction expressly allowed the jury to consider whether Defendants had violated the New York State Executive Law regardless of their determination with respect to Plaintiff's federal claim. Defendants agreed to the language of the charge concerning N.Y. Executive Law § 296 during the charge conference. *See* Tr. at 1020-1022. Moreover, Defendants agreed to the language of Questions 3 and 4 on the verdict sheet regarding Executive Law § 296, as illustrated in the following colloquy:

| | |
|---|---|
| THE COURT: | Let's go down to question 3.  Any problem with question 3 or 4 for that matter?  I don't see anything on your list. |
| MR. DERRICO: | No problem with 3. |
| THE COURT: | Mr. Brewington? |
| MR. BREWINGTON: | None |
| THE COURT: | Number 4? |
| MR. DERRICO: | That was I think already ruled on with the additional instructional language.  We are going to leave that in. |
| THE COURT: | Tell me what you mean by "additional instructional language." |
| MR. DERRICO: | If you answer – |
| THE COURT: | I wanted to know the question itself.  So the question is all right with you? |
| MR. DERRICO: | Yes. |

Tr. at 1034-35.  Nor did Defendants raise any objection to the charge language of Executive Law

§ 296 when the final changes were made to the charge as a whole after revisions to the charge were

read to the jury, or at any time before the jury was sent out to deliberate.  *See* Tr. at 1138-1146,

1149-1154.

Likewise, Defendants did not challenge the verdict sheet prior to the time it was given to

the jury, nor have they challenged the instruction here.[1]  Indeed, Defendants' counsel expressly

---

[1]     Where a party has not raised a timely objection under Rule 51, the sufficiency of the charge can be reviewed for "fundamental error" only. *See Jarvis,* 283 F.3d at 62. Fundamental error is a more exacting standard than the "plain error" standard in the criminal context and must be "so serious and flagrant that it goes to the very integrity of the trial." *Shade v. Housing Auth. of New Haven,* 251 F.3d 307, 312 (2d Cir. 2001).  I do not find a fundamental

stated "I'm fine with the verdict sheet." Tr. at 1064. Accordingly, Defendants' motion for a new trial based upon a purportedly inconsistent verdict is denied.

## C. The Punitive Damages Award As "Grossly Excessive"

Defendants also argue that a new trial is warranted because there is no evidence to support the jury's award of punitive damages. *See* Def. Op. Br. at 9. It is Defendants' contention that since the jury found Defendant Kellerman liable for negligence but not defamation, "the jury's verdict supports the position that Mr. Kellerman's conduct did not rise to a level that would warrant an award of punitive damages." *Id.* at 11. On the other hand, Plaintiff asserts that an award of punitive damages is supported by the record, but offers no citation to any actual testimony which supports its position. Plaintiff instead focuses on Defendants' failure to object to the punitive damages jury charge. It is Plaintiff's position that Defendants' failure to object to the charge "waived any objection they may have to the jury's award of punitive damages." Pl. Mem. at 11. The Court agrees. Indeed, Defendants concede that no objection was raised with respect to the inclusion of an instruction regarding punitive damages and they have abandoned this argument. *See* Def. Nov. 17, 2007 Mem. at 10. Thus, Defendants' challenge to the punitive damage award is limited to a perceived lack of evidence to support the award.

The purpose of punitive damage awards is to punish the defendant and to deter the defendant and others from engaging in similar conduct in the future. *See Smith v. Wade,* 461 U.S. 30, 54 (1983). "The decision to award punitive damages is a discretionary moral judgment made by the jury." *Niemann v. Whalen,* 928 F. Supp. 296, 300 (S.D.N.Y. 1996). Nevertheless, there is a "concern about punitive damages that 'run wild.'" *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1

---

error in the charge, nor have the Defendants raised such issue.

13

(1991). Punitive damages must be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Id.* at 21. Therefore, "[p]unitive damages may be awarded for a civil rights claim if 'the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves *reckless or callous indifference to the federally protected rights of others.*'" *Tolbert v. Queens College,* 242 F.3d 58, 77 (2d Cir. 2001) (quoting *Smith,* 461 U.S. at 56) (emphasis in original).

In *BMW of North America, Inc. v. Gore,* 517 U.S. 559 (1996), the Supreme Court enumerated three factors that must be considered when determining whether the award of punitive damages is excessive. Courts reviewing the reasonableness of punitive damages awards must consider: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *DiSorbo v. Hoy,* 343 F.3d 172, 186 (2d Cir. 2003) (citing *BMW,* 517 U.S. at 575-85); *Morris v. Flaig*, No. 02-CV-5988, 2007 WL 1029337, at *19 (E.D.N.Y. Mar. 31, 2007). Defendants have not satisfied any of these criteria and, therefore, their motion for a new trial on the issue of punitive damages must be denied.

First, as to reprehensibility, the jury was charged that punitive damages may be awarded if the jury concluded that Defendants acted "maliciously, or wantonly, or oppressively" and each of these elements was defined. "Maliciously" was defined for the jury as conduct "prompted or accompanied by ill will, or spite, or grudge, either toward the plaintiff, individually, or toward all persons in the group or category of which the injured person is a member." "Wantonly" was defined as conduct undertaken "in reckless or callous disregard of, or indifference to, the rights of

14

the injured person."  The jury was further instructed that "an act or a failure to act is 'oppressively' done, if done in a way or manner which injures, or damages, or otherwise violates the rights of another person with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness or misfortune of another person."  The parties did not challenge this instruction.

Punitive damages have been awarded in a variety of discrimination cases based on the general reprehensible nature of the discriminatory conduct.  *See, e.g., Kolstad v. American Dental Ass'n,* 527 U.S. 526 (1999) (in the employment discrimination context holding that "the terms 'malice' and 'reckless' ultimately focus on the actor's state of mind," making a showing of egregious or outrageous discrimination unnecessary); *Alexander v. Riga,* 208 F.3d 419, 431 (3d Cir. 2000) (finding of intentional discrimination in violation of the Fair Housing Act allows recklessness and malice to be inferred "when a manager responsible for showing and renting apartments refuses to deal with African-Americans about the apartment, and misrepresents the apartment's availability"); *Cioffi v. New York Comty. Bank,* 465 F. Supp. 2d 202, 214 (E.D.N.Y. 2006) (jury finding of liability in employment discrimination enough to support punitive damage award where jury rejected Defendants' pretext for firing and Defendants had failed to engage in interactive process required by ADA); *Connelly v. Bidermann Indus., Inc.,* 56 F. Supp. 2d 360, 369 (S.D.N.Y. 1999) ("Punitive damages are recoverable in ADA actions in which the complaining party demonstrates that the respondent engaged in a discriminatory practice . . . with malice or reckless indifference to the federally protected rights") (citations omitted).

Here, the jury concluded that Defendants intentionally discriminated against Plaintiff on the basis of race because race was a motivating factor in the decision by Defendants (1) to accuse

15

Plaintiff of criminal conduct, (2) not to allow her to purchase items and (3) to effect a citizen's arrest of Plaintiff. As the court in *Colbert v. Furumoto Realty, Inc.*, 144 F. Supp. 2d 251, 258 (S.D.N.Y. 2001) held, I "fail to see how racial discrimination is not sufficiently reprehensible to warrant a punitive damages award." The record here, including Defendant Kellerman's own testimony, fully supports the jury's finding of reckless or callous disregard or indifference to Plaintiff's federally protected rights. It is also worth noting that not a single representative of the corporate defendant appeared in the courtroom during trial, or sat at counsel table, or testified on behalf of Defendant Modell's.

The second factor announced by the Supreme Court in *BMW* requires an assessment of the ratio of the punitive damages to the compensatory damages. In this action, the jury awarded Plaintiff $50,000 for pain and suffering, $280,000 for humiliation and emotional distress and $8,004.72 for legal fees incurred in the defense of the underlying criminal action. The jury awarded Plaintiff punitive damages of $135,000 from Defendant Modell's and $15,000 from Defendant Kellerman. Here, the punitive damages are less than half the compensatory damages and are plainly reasonable. The standard for measuring excessiveness is whether the award is a shocks to the "judicial conscience" or constitutes a "denial of justice." *Cioffi*, 465 F. Supp. 2d at 215. An award of punitive damages less than the compensatory damages award clearly does neither.

The third factor set forth in *BMW* is a comparison of the "punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." In the context of discrimination cases, a number of courts have held that since there is no limit to the amount of punitive damages available, this factor is easily satisfied. *See, e.g., Colbert,* 144 F. Supp. 2d at

258; *Stern v. Michaelangelo Apts., Inc.*, No. 97-CV-9532, 2000 WL 33766107 (S.D.N.Y. Jan. 24, 2000)*; Broome v. Biondi*, 17 F. Supp. 2d 211, 229 (S.D.N.Y. 1997).

Comparing the punitive damages award here to awards in other discrimination cases is not particularly instructive because courts have upheld a wide range of awards. *See, e.g., Merriweather v. Family Dollar Stores of Indiana, Inc.,* 103 F.3d 576 (7th Cir. 1996) (retaliatory discharge; $25,000 punitive damage award); *Greenbaum v. Svenska Handelsbanken,* 979 F. Supp. 973 (S.D.N.Y. 1997) (gender discrimination and retaliation; punitive damage award of $1.25 million); *Martini v. Federal Nat'l Mortgage Ass'n.,* 977 F. Supp. 464 (D.D.C. 1997) (gender discrimination and retaliation; punitive damage award reduced to $200,000); *Ikram v. Waterbury Bd. of Educ.,* No. 3:95CV2478, 1997 WL 597111 (D. Conn. Sept. 9, 1997) (retaliation; $150,000 punitive damage award); *Iannone v. Frederic H. Harris, Inc.,* 941 F. Supp. 403 (S.D.N.Y. 1996) (retaliation; punitive damage award reduced to $50,000); *Dickerson v. HBO & Co.*, No. 92-2758, 1995 WL 767193 (D.D.C. Dec. 21, 1995) (retaliation; punitive damage award reduced to $100,000). Since the punitive damages awarded by the jury here fall squarely in this range, I find this third and final factor weighs in favor of Plaintiff. Accordingly, Defendants' motion for a new trial with respect to the issue of punitive damages is denied.

D.      The Compensatory Damages Award As "Grossly Excessive"

Defendants also argue that the compensatory damage award is grossly excessive and requires a new trial. *See* Def. Op. Br. at 15. The jury awarded Plaintiff total compensatory damages of $338,004.72. Broken down by category, the jury awarded Plaintiff $50,000 for the physical discomfort she experienced as a result of being handcuffed and placed into custody; $280,000 for past humiliation and emotional distress and $8,004.72 for legal fees incurred in

defense of the criminal action. The jury did not award any damages for future humiliation and emotional distress.

The "calculation of damages is the province of the jury," *Ismail v. Cohen,* 899 F.2d 183, 186 (2d Cir. 1990), and such an award should only be overturned if it "shock[s] the judicial conscience and consitute[s] a denial of justice." *O'Neill v. Krzeminski,* 839 F.2d 9, 13 (2d Cir. 1988). In deciding whether a particular verdict meets this standard, courts should look to other cases involving similar facts, but with the caveat that each case presents "'a unique set of facts and circumstances.'" *Scala v. Moore McCormack Lines, Inc.,* 985 F.2d 680, 684 (2d Cir. 1993) (quoting *Nairn v. Nat'l R.R. Passenger Corp.,* 837 F.2d 565, 568 (2d Cir. 1988)).

In cases involving "'so-called 'garden-variety' mental-anguish claims . . . the awards hover in the range of $5,000 to $30,000." *Bick v. City of N.Y.,* No. 95 Civ. 8781, 1998 WL 190283, at *25 (S.D.N.Y. Apr. 21, 1998). These cases are defined as those in which the plaintiff testifies to her own condition and thereby provides the only evidence, typically describing the emotional distress in vague or conclusory terms. *See Reiter v. Metropolitan Transp. Auth. of N.Y.,* No. 01 Civ. 2762, 2003 WL 22271223 (S.D.N.Y. Sept. 30, 2003). This is not such as case. Here, Plaintiff has provided evidence that "she suffered significant mental anguish due to the discrimination she suffered in being falsely arrested and falsely accused by Defendants." *See* Pl. Br. at 14. The evidence includes "Plaintiff's description of the specific nature of her several hours of confinement, the psychological injury she sustained during that detention, and the subsequent psychological injury as a result of the experience of arrest and trial." *Id.*; Tr. at 346-348, 359, 352. This testimony was corroborated by witnesses Olga and Tiffany Sanders as well as Plaintiff's treating psychologist, Dr. James Lassiter, who testified at length and was thoroughly cross-

18

examined as to the cause and effect relationship between the underlying incident and the resulting

psychological injury sustained by Plaintiff and for which she sought treatment.  *See, e.g.,* Tr. at 65,

68, 75, 174, 231, 240 .

Thus, I am more properly guided by the cases that have awarded compensatory damages for

emotional distress on the basis of allegations of severe emotional distress corroborated by other

evidence.  *See, e.g., Quinn v. Nassau County Police Dep't.,* 53 F. Supp. 2d 347 (E.D.N.Y. 1999)

("The award of $250,000 for emotional distress is in line with similar damages awards in this

Circuit"); *Hughes v. Patrolmen's Benevolent Assoc. of N.Y., Inc.*, 850 F.2d 876, 884 (2d Cir.)

(allowing award of $575,000 against defendant police officers for protracted course of harassment

against fellow officer), *cert. denied,* 488 U.S. 967 (1988); *McIntyre v. Manhattan Ford Lincoln-*

*Mercury, Inc.*, 669 N.Y.S.2d 122 (Sup. Ct. 1997) (affirming award of $750,000 for emotional

distress based in part on testimony of treating physician).   The award of compensatory damages in

this case of $240,000 for emotional distress is plainly within those parameters and is supported by

the testimony of Plaintiff, Olga Sanders, Police Officer Goodale and Dr. James Lassiter.

Consequently, a new trial on this issue is not required.

With respect to compensatory damages awarded to Plaintiff for the physical discomfort she

experienced as a result of being handcuffed and placed into custody, Defendants argue that

"$50,000 for being handcuffed is grossly excessive particularly in light of the plaintiff's testimony

that the maximum amount of time that she was handcuffed was between 3 to 4 hours."  Def. Mem.

at 17.  Defendants' argument ignores a very significant component of this award of damages –

compensation for wrongly being placed in custody.  The Second Circuit has recognized that

"damages for deprivation of liberty redress the denial of free movement and the violation done to

[plaintiff's] dignity as a result of the unlawful detention, and not the physical and mental injuries from the incident." *Gardner v. Federated Dep't. Stores, Inc.,* 907 F.2d 1348, 1353 (2d Cir. 1990). The court in *Gardner* upheld an award of $150,000 for pain and suffering but reduced the jury's award of $150,000 for deprivation of liberty from $150,000 to $50,000.

The plaintiff in *Gardner* had been detained for approximately eight hours, a comparable detention to the Plaintiff in the instant action. In *Gardner*, the plaintiff was detained for two hours in a store detective's cell and for six hours in a jail cell. Here, Plaintiff's unrefuted testimony was that she was handcuffed in the store in front of friends, including a child and other customers, (Tr. at 308); was escorted by several policemen out of the store in handcuffs (*Id.* at 309-312); spent 15 minutes sitting in front of the store in the police car (*Id.* at 317); spent more than an hour handcuffed to a bar in a cubicle being ridiculed by the officers (*Id.* at 322); was denied access to the bathroom for a half hour and then required to use the toilet in the presence of an officer (*Id.* at 324); and spent three hours handcuffed in the Riverhead police precinct (*Id.* at 325). To compare the award in *Garner* to the jury's award here, "we must take into account inflation, as the reasonable range for [plaintiff's] injuries today is higher than it would have been ten years ago." *DiSorbo v. Hoy,* 343 F.3d 172, 185 (2d Cir. 2003). Using the Bureau of Labor Statistics inflation calculation, an award of $50,000 in 1990 would be the equivalent of $79,319.82 in 2007. Thus, the jury's award of $50,000 for deprivation of liberty was not excessive and Defendants' request for a new trial on this basis is denied.

E.     The Testimony of James Lassiter Was Properly Admitted

Finally, Defendants argue that a new trial is required because the testimony of Dr. James Lassiter, Plaintiff's treating psychologist, was improperly admitted. During the trial, Defendants

moved to strike the testimony of Dr. Lassiter and to dismiss Plaintiff's emotional distress claim

because:

> (1) Dr. Lassiter failed to state on the record within a reasonable
> degree of psychological certainty that the events of March 18, 2004
> were the competent producing cause of Plaintiff's alleged generalized
> anxiety disorder and

> (2) Dr. Lassiter's patient history was inaccurate in that he did not
> know about Plaintiff's motor vehicle accident which would require
> the jury to speculate as to which event caused Plaintiff's alleged
> generalized anxiety disorder.

This motion was denied in its entirety. It is worth noting that Defendants were aware of Dr. Lassiter

prior to trial. His records concerning Plaintiff were provided to Defendants during discovery. In

addition, Dr. Lassiter's name was listed as one of Plaintiff's fact witnesses in the Joint Pre-Trial

Order and he was identified as the "treating psychologist." *See* DE 21 at 6-7. In the same Joint Pre-

Trial Order, Defendants objected to the introduction of Dr. Lassiter's testimony "on the ground that

Plaintiff failed to comply with Rule 26 (a)(2) pertaining to introduction of expert testimony." *Id.* at

9-10. However, Plaintiff never proffered Dr. Lassiter as an expert witness and Dr. Lassiter testified

at trial as a treating psychologist, not as an expert. Defendants were not prevented from taking Dr.

Lassiter's deposition (nor from conducting a Rule 35 examination of Plaintiff) prior to trial, but for

reasons not known to this Court, Defendants did not do so. Nor did Defendants file a motion *in*

*limine* to preclude Dr. Lassiter's testimony.

During Dr. Lassiter's trial testimony, Defendants' counsel requested a sidebar, at which time

counsel argued that the questions being asked by Plaintiff's counsel were eliciting expert opinions.

Tr. at 232-33. After hearing from both sides, I overruled defense counsel's objection finding that

the questions were within the parameters of a treating physician's permissible testimony. *Id.* at 235-36. Thereafter, Defendants' counsel conducted a substantial cross-examination of Dr. Lassiter, covering some 18 pages of the transcript. Tr. at 250-68. On completion of Dr. Lassiter's examination, Defendants moved to strike his entire testimony on the grounds that

> at no time during the direct examination by Plaintiff's counsel did Plaintiff's counsel ask Dr. Lassiter, within a reasonable degree of psychological certainty, whether the alleged symptoms, the anxiety and the other colloquy he testified to, were caused by the alleged incident in question.

Tr. at 282-83. I reserved decision until later in the trial. Tr. at 284.

At the time I ruled on the Rule 50(a) motions, I also rendered a decision on Defendants' motion to strike Dr. Lassiter's testimony. In denying that motion, I ruled that Dr. Lassiter was presented as a treating psychologist, not an expert, and that the cases relied upon by Defendants focused on expert testimony and were consequently unavailing. Tr. at 866-67. I further held that the heart of Defendants' objections to Dr. Lassiter's testimony went to the weight of the testimony and not its admissibility. Defendants spent ample time on cross-examination addressing the weight to be given to that testimony. Tr. at 869.

It is well settled that "treating physicians can be deposed or called to testify at trial without the requirement of a written report." *Lamere v. N.Y. State Office for the Aging*, 223 F.R.D. 85, 89 (N.D.N.Y. 2004). The court in *Lamere* held that "although she discusses the care and treatment of her patient and offers opinion testimony as permitted by Rule 702, treating doctors are deemed to be neither retained nor specially employed experts, unless they were specifically retained for such litigation purposes." *Lamere*, 223 F.R.D. at 89 (citing *Zanowic v. Ashcroft (I),* No. 97-CV-5292, 2002 WL 373229, at *2 (S.D.N.Y. Mar 8, 2002)). In *Zanowic,* Magistrate Judge Pitman held that

22

"there can be no serious dispute that, as a treating physician, Dr. Giovinazzo was free to testify to

opinions he formed in the course of treating [plaintiff], without regard to the disclosure

requirements of Rule 26(a)(2). *Zanowic,* 2002 WL 373229, at *2.

At trial, I held that Dr. Lassiter made a connection between the underlying incidents here

and the cause for which he treated Plaintiff in this case. Tr. at 868. As noted, I found that the issues

raised went to the weight of Dr. Lassiter's testimony but did not provide a basis to strike his

testimony. *Id.* at 868-69.

Defendants now argue that a new trial is required because the testimony of Dr. Lassiter was

erroneously admitted. Def. Op. Br. at 17. Defendants claim that Dr. Lassiter's testimony must be

stricken because he saw Plaintiff more than a year after the incident underlying the Complaint and

then saw her only seven times. These facts do not provide a basis to strike Dr. Lassiter's testimony,

but instead go to the weight of that testimony. *See, e.g., Bitici v. N.Y. City Transit Auth.,*66

N.Y.S.2d 188 (App. Div. 1997) (even though no examination until two and a half years after the

accident, "[i]t is within the province of the fact finder, not the summary judgment court, to

determine the weight to be given to the examination and findings of plaintiff's doctor"); *Cassagnol

v. Williamsburg Plaza Taxi Inc.,* 651 N.Y.S.2d 518, 519 (App. Div. 1996) ("While one might

properly question the weight to be accorded to an examination conducted by defendants' doctor two

years and nine months after the accident, that ultimately is an issue for the finder of fact.").

Defendants also contend that because Dr. Lassiter had not seen Plaintiff as a patient for close

to two years prior to trial, his testimony is speculation and conjecture and must be stricken. Again,

this argument goes to the weight of Dr. Lassiter's testimony, not its admissibility. Defendants' final

argument, that Plaintiff's failure to inform Dr. Lassiter that she had experienced emotional distress

as a result of a subsequent automobile accident fares no better. Defendants had the opportunity to cross-examine Dr. Lassiter in an effort to determine if this omission impacted his decision and, if so, how. Defendants' asked Dr. Lassiter if Plaintiff had told him she had been in a car accident. Tr. at 278. The doctor responded "no." When asked if he would have wanted to know that, Dr. Lassiter responded "yes." No further questions on the topic were asked. *Id.* The jury heard this testimony and gave it the weight the jury deemed appropriate in reaching their conclusion.

While a trial judge's erroneous evidentiary rulings may furnish a basis for granting a post-verdict motion for a new trial under Rule 59, *LNC Investment, Inc. v. First Fidelity Bank*, 126 F. Supp.2d 778, 787 (S.D.N.Y. 2001), I find no error in my earlier decision to allow Dr. Lassiter to testify. Defendants' motion for a new trial on this basis is therefore denied.

III.    **CONCLUSION**

For the reasons set forth above, Defendants' motion for a new trial pursuant to Federal Rules of Civil Procedure 49(b) and 59(a) is denied in its entirety. The Clerk is directed to enter judgment accordingly and is advised that this order closes the case.

**SO ORDERED.**

Dated: Central Islip, New York
       March 31, 2008

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge